UNITED STATES of America

v.

Moses SCHREIBER, Defendant.

No. 66 Cr. 326 (RLC).

United States District Court,
S. D. New York.

April 12, 1982.

John S. Martin, Jr., U. S. Atty. for the S. D. of New York, New York City, for the United States of America; Robert N. Shwartz, Asst. U. S. Atty., New York City, of counsel.

Abberley Kooiman Marcellino & Clay, New York City, for defendant; John P. Keegan, New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

Moses Schreiber was indicted on March 31, 1966 on a 12 count indictment charging various violations of federal law in connection with obtaining loans of the Federal Housing Administration ("FHA"). At the time of his indictment, Schreiber was living in London. In July, 1964, he and his family had moved to London to be near his father who was ill at the time. Initially, he resided at his father's home at 48 Moresby Road, but he subsequently moved to his own residence at 30 Seymour Court, Cazenove Road where he has lived up to the present.

Schreiber has engaged in a variety of business activities in London, and from 1964 to February 9, 1969, he had to secure a permit to work by registering annually with

the Metropolitan Police in London as an alien resident. His passport was renewed in 1965, 1970 and 1975 by the American Embassy in London. His 1965 application records both his London address and his former address in Brooklyn, 357 Bedford Avenue. His youngest child was born in London in December, 1964, and a birth certificate for the child was issued by the American Embassy.

When he applied for renewal of his passport at the American Embassy in 1980, renewal was refused because a notice of the pending indictment had been placed in his file. A hearing was held at the American Embassy concerning the matter. The proceeding resulted in the revocation of his passport. The matter was appealed and, in January, 1981, the revocation was upheld.

On February 2, 1981, without returning to the United States, Schreiber moved in this court to dismiss the indictment, pursuant to Rule 48(b), F.R.Cr.P., alleging violations of his rights under the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* On May 28, 1981, on the grounds that the claims asserted turned on a number of factual disputes, the motion was denied without prejudice pending a hearing at which Schreiber's presence was required. Schreiber thereupon voluntarily returned to New York and a two-day hearing was held on November 23–24, 1981. Subsequent to the hearing, the parties filed post trial memoranda and a stipulation as to what one Joseph Yanklewitz would testify if called as a witness.

Schreiber, his sister, brother-in-law, uncle, Special FBI Agent William Taylor, Special FBI Agent Wayne Morse, now retired, and two other witnesses testified.

Schreiber testified that he had left this country in July, 1964, and did not know when he left that he was under investigation by the government for his role in securing the FHA loans. He did not recall "to the best of his recollection" being interviewed at FBI headquarters on December 26, 1963, and "to the best of his recollection" did not recall any telephone conversation with an FBI agent on March 9, 1964. He further testified that he had kept in touch with his sister and his brother-in-law in this country; they made several visits to London and knew where he was and how to reach him. He did not learn of the indictment until 1978. A few years before he was apprised of the pending charges, he had been involved in a civil litigation, and his solicitor had advised him that his adversaries questioned his credibility because of some problem pending in the United States. He did not learn anything more. In November, 1978, he asked his solicitor, Peter Brown, to find out what the problem was. Brown made contact with Abberley, Kooiman, Marcellino & Clay in New York, his counsel at the instant hearing, and from that source he learned for the first time about the indictment. He did nothing at the time because his solicitor advised him that he had no responsibility to take any affirmative steps, but that it was up to the government to proceed.

When he left New York in 1964, he packed all of his important business papers in a cushion and left it with his sister.

Miriam Stern, Schreiber's sister, testified that her brother had left his papers with her and the papers had been stored in a warehouse. There was a fire and the papers, along with carpets, had been destroyed. She testified further that she had never been visited by the FBI and her husband never told her about the FBI visiting him. Herman Stern, her husband, testified that he did not "to the best of [his] knowledge," recall whether anybody from the FBI contacted him about Schreiber.

Two witnesses testified for the government, Special Agent William Taylor who was the chief FBI special agent in the case until February, 1964, and Special Agent Wayne Morse, now retired, who succeeded Taylor as chief FBI special agent assigned to the case when Taylor was assigned some other duty.

Taylor testified that he interviewed Schreiber on December 26, 1963, at FBI headquarters in New York. Morse recalled being present at the interview. Taylor filed a report of the interview on January 7, 1964. He could not, however, recall the

details of the interview and the report was received as past recollection recorded. The report indicates that Schreiber was advised by Taylor that he and Morris Weiss were the targets of an investigation concerning FHA loans they had obtained in violation of federal laws. Schreiber refused to make any statement without consulting with his lawyer, Joseph Yanklewitz of 983 Broadway, Brooklyn, New York, whom he would not be able to see until sometime early in January. The report gives Schreiber's age as 32, his place and date of birth as Oredea Uhare, Romania, on February 15, 1931, his then current address as 537 Bedford Avenue, Brooklyn, New York, his place of employment as Stanton Salvage Co., 110 Stanton Street, New York City, his wife's name as Irene, and his religion as Orthodox Jew. The personal details and the address of Yanklewitz are all accurate.

Special Agent Morse testified that he telephoned Schreiber on March 9, 1964. He filed a report of the substance of this conversation. This report was received as past recollection recorded since Morse had no present recollection of the substance of the conversation. The report states that Schreiber indicated that on the advice of counsel he did not wish to discuss the loans, that while he signed some documents to secure the loans, he considered the matter to be Morris Weiss' responsibility and he was in no position to pay.

On February 16, 1966, inquiry was made of the passport office in New York and Morse was advised that the office could not locate any record of a passport being issued to Schreiber in 1964 or 1965. After the indictment was handed down on March 31, 1966, various reports show that on April 12, 1966, Morse filed a stop order request with the Immigration and Naturalization Service requesting that Schreiber be taken into custody by reason of the pending indictment if he sought entry at a port of the United States. This stop order request was renewed on November 23, 1971, and November 23, 1976.

On May 6, June 22 and June 26, 1966, Morse sought to locate Miriam Stern at 939 44th Street, Brooklyn, New York, without success. On May 6, 1966, Morse went to 537 Bedford Avenue, Brooklyn, New York, and interviewed Sandor Katz who advised him that Schreiber, who used to live at that address, had left the United States in 1964. Katz claimed to have had no contact with Schreiber since and no information concerning Schreiber's present location or activities.

On July 6, 1966, Morse's report indicates that he interviewed Herman Stern at his place of business, 1076 38th Street, Brooklyn, New York. The report attributes to Stern the following statements: that he was aware of the charges pending against his brother-in-law; that he and his wife, Miriam, continued to reside at 939 44th Street, Brooklyn, New York; that he did not know the whereabouts of Schreiber; that the latter had left the country for Europe two to two and a half years previously; that he and his wife had never been close to Schreiber and that he did not know the whereabouts of any of his wife's relatives in Europe; and that if he found where Schreiber was, he would notify the FBI. Reports indicate that Morse subsequently spoke on the telephone to Herman Stern on August 12, 1966, November 14, 1966, March 29, 1967, July 21, 1967, and December 8, 1967. On each occasion, Stern stated he still did not know Schreiber's whereabouts. In the March 29, 1967 conversation Stern said he believed Schreiber was living in England but he did not know where. Morse testified at the hearing that he had the impression towards the end of these telephone contacts that Stern was becoming impatient with him because of his continued inquiries about Schreiber. Morse's reports also show unsuccessful attempts to reach Herman Stern at the 44th Street address.

A July 6, 1966 FBI report shows that the government knew that a passport had been issued to Schreiber by the American Embassy in London on January 20, 1965, and that he had given his address as 30 Seymour Court, Cazenove Road in London. The report states that Schreiber might be in London or Israel. In a report dated April 29,

1966, Assistant United States Attorney Robert King writes that Nathan Landisburg called and stated that he was associated with Yanklewitz, that he was in contact with someone in contact with Schreiber who wanted to know the details of the indictment and that Schreiber might be in England.

An August 6, 1966 letter to Robert Morgenthau, United States Attorney, from Assistant Attorney General, Criminal Division, Department of Justice, signed by the Chief, Administration Regulations Section states that it is "very doubtful" that Schreiber could be extradited under the treaty with England for the offenses charged. The letter suggests that extradition documents be submitted for a final determination. There is no record of this step being taken.

A September 5, 1966 FBI report states that on August 10, 1966, a confidential source informed the government that Schreiber had arrived in England in January, 1965; that he resided at 3030 Seymour Court, Cazenove Road in London, had bought a residence at 212 Upper Clapton Road, and was teaching at Orthodox Jewish schools.

*Determination*

The facts do not seem difficult to determine. Schreiber was interviewed by Special Agent Taylor in December, 1963 and was advised at the time that he was the target of an investigation to determine whether he should be indicted. Special Agent Morse spoke to him on the telephone the following March. The Taylor report contains accurate details about Schreiber. Even the address of Yanklewitz is correct.

Counsel filed a stipulation that Joseph Yanklewitz, if called, would testify that he has maintained offices at 983 Broadway, Brooklyn for the past 25 years, that he met Schreiber on several occasions through Isidore Ashkenazy with whom Schreiber conducted business and that the meetings usually took place in his offices. Yanklewitz was never retained by Schreiber and has no present recollection of whether any matter concerning Schreiber was referred to Nathan Landisburg, but he did refer criminal matters to Landisburg.

It is highly unlikely that Schreiber would forget being interviewed at FBI headquarters by Special Agent Taylor or receiving a telephone call from Special Agent Morse especially when these contacts concerned his being the target of a criminal investigation. My conclusion, therefore, is that Schreiber lied when he stated that he did not recall these contacts. Similarly, Herman Stern's failure to recall a personal interview with an FBI agent concerning Schreiber's whereabouts and a series of telephone calls from Special Agent Morse cannot be credited. Stern did not strike the court as one who would readily forget such incidents, particularly since the persistence of the agent became bothersome.

There is no reason for the government to have contrived these reports. Two were prepared before the indictment was filed. The other reports post date the indictment, the last being filed in December, 1967, long before the government could have known that it would be faced with a motion to dismiss the indictment.

Schreiber and Stern, on the other hand, have every motive to lie. If Schreiber knew in the 1960's that he was under indictment, his speedy trial claims, while not necessarily foreclosed, become somewhat attenuated. If Stern talked to Morse and denied knowing where Schreiber was when it is now clear that such a statement was false, he could face prosecution. Therefore, their carefully orchestrated "to the best of my recollection" responses are totally lacking in credibility.

While there may be no basis to conclude that Schreiber moved to England in 1964 to avoid prosecution, a fair inference is that the trouble that loomed on the horizon because of his role in the FHA loans helped him make up his mind to leave this country to join his father in London. When the indictment was filed at the end of March, 1966, Schreiber had then been living in London for over a year and a half. Stern told Morse at their face-to-face meeting in July, 1966, that he knew of the charges Schreiber

faced, and it is inconceivable that Stern did not discuss the FBI's interest in Schreiber with his wife or that he did not get word to Schreiber in 1966 that he was under federal indictment.

Accordingly, the court concludes that Schreiber knew of the indictment no later than the summer of 1966. It is also clear that the government during approximately the same period in 1966 learned that Schreiber was living in London and had his correct address or sufficient information to be able to locate him there.

■ While Schreiber was not a fugitive in July, 1964 when he left this country, he became in effect a fugitive in the summer of 1966 when he knew that he was under indictment and made no effort to return to this country to face the charges. One, of course, cannot be a fugitive unless he was present in the demanding state at the time the crime was committed, *United States ex rel. Vitiello v. Flood*, 374 F.2d 554, 556 (2d Cir. 1967); *Moncrief v. Anderson*, 342 F.2d 902, 904 (D.C.Cir.1964); *People of the State of Illinois v. Elrod*, 511 F.Supp. 559, 560 (N.D.Ill.1981); *United States v. Steinberg*, 478 F.Supp. 29, 32 (W.D.Ill.1979), and in this circuit it has been held that mere absence from the jurisdiction without regard to intent is not sufficient to make one a fugitive. Flight must be for the purpose of avoiding prosecution. *Jhirad v. Ferrandina*, 486 F.2d 442, 444 (2d Cir. 1973), *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976). However, the intent necessary to render absence flight may be found when one already outside the country declines to return as well as when one leaves the country to avoid prosecution. No "meaningful distinction exists between those who leave their native country and those who, already outside, decline to return." *Jhirad v. Ferrandina*, 536 F.2d 478, 483 (2d Cir.), *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976).

■ The *Jhirad* case is instructive. *Jhirad* was found to have left India without having formed a decision to flee prosecution, but at some point while outside the country he decided not to return. Schreiber is similarly situated. While in England in 1966 he learned that he had been indicted but decided not to return to face the charges. As of the time he made that decision he became a fugitive from prosecution. Since that decision was made in 1966 and was adhered to until 1981, it is clear that Schreiber did not want a speedy trial. That desire, if it exists at all, is of recent origin and arises from his need for a United States passport. If his United States passport had been renewed in 1980, Schreiber would have found no cause to complain about the delay in his prosecution. The speedy trial requirements should not operate to reward a recalcitrant and reluctant defendant. *See United States v. Estremera*, 531 F.2d 1103, 1108 (2d Cir.), *cert. denied*, 425 U.S. 979, 96 S.Ct. 2184, 48 L.Ed.2d 804 (1976).

■ The government has exercised due diligence. It made every effort to learn Schreiber's whereabouts through relatives in the United States. The sister, Miriam, could never be located at her home. The brother-in-law was located but refused to give the government Schreiber's address in London, which, of course, he knew.

The State Department apparently did not get information concerning these charges to the American Embassy in London until sometime after 1975, the last time a passport was issued to Schreiber before it was revoked in 1980.

The Department of Justice advised the United States Attorney of this district that under the treaty with England it was dubious that extradition would be possible. While it was suggested that extradition papers be prepared for submission to Washington for final determination and there is no record of any such further submission, it is apparent that it was determined that extradition was unavailable. Unlike the defendant in *United States v. Judge*, 425 F.Supp. 499, 502–3 (D.Mass.1976), Schreiber knew that he had been indicted, and the government advised his family of the charges and sought to have INS authorities take him in custody if he returned to this

country. Law enforcement efforts finally succeeded in getting information about Schreiber's pending indictment in his passport file in the American Embassy in London. These efforts were sufficient to constitute due diligence. *See United States v. Steinberg,* 478 F.Supp. 29 (N.D.Ill.1979).

Schreiber indicates that all his papers have been destroyed. His and his sister's and brother-in-law's lack of credibility renders that testimony suspect. Whether the lost papers have so prejudiced his ability to defend against the charges can only be determined at trial. *See United States v. MacDonald,* 435 U.S. 850, 858, 98 S.Ct. 1547, 1551, 56 L.Ed.2d 18 (1978); *United States v. Marion,* 404 U.S. 307, 326, 92 S.Ct. 455, 466, 30 L.Ed.2d 468 (1971). The long period of time that has elapsed may prove to be more prejudicial to the government's chance for a successful prosecution than to Schreiber's defense.

The motion to dismiss the indictment is denied.

IT IS SO ORDERED.