**Henry RAYBORN, Petitioner–Appellant,**

v.

**Charles SCULLY, Superintendent, Green Haven Correctional Facility, and Robert Abrams, New York State Attorney General, Respondents–Appellees.**

No. 1247, Docket 87–2314.

United States Court of Appeals, Second Circuit.

Argued June 13, 1988.

Decided Sept. 20, 1988.

Abraham L. Clott, The Legal Aid Soc., Federal Defender Services Unit, New York City, for petitioner-appellant.

Morrie I. Kleinbart, Asst. Dist. Atty., New York City (Robert M. Morgenthau, Dist. Atty. for New York County, Marc Frazier Scholl, Asst. Dist. Atty., New York City, of counsel), for respondents-appellees.

Before OAKES, MESKILL and PIERCE, Circuit Judges.

PIERCE, Circuit Judge:

Henry Rayborn appeals from a judgment of the United States District Court for the Southern District of New York, Robert J. Ward, *Judge*, dismissing his petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254. Rayborn contended before the district court that the January 26, 1979, judgment of a New York state court convicting him of second-degree murder was unconstitutional because, *inter alia*, New York state authorities had violated his sixth amendment right to a speedy trial. The district court dismissed Rayborn's petition by memorandum decision dated July 1, 1987, but granted a certificate of probable cause to appeal to this Court. Despite the considerable pre-trial delay in this case, after reviewing the relevant *Barker v. Wingo* factors, we affirm the dismissal of appellant's petition for a writ of habeas corpus.

## BACKGROUND

### A. *Pre–Trial Delay*

On September 9, 1971, Jesse Lee Starks was shot to death in his basement apart-

ment in New York City. Shortly after the Starks homicide, Philadelphia police sent a letter to New York police informing them that they had arrested Henry Rayborn, a suspect in the New York murder case, on an unrelated Philadelphia homicide charge. On October 5, 1971, the Criminal Court of the City of New York issued a warrant for Rayborn's arrest.

Detective Dominick Bologna of the New York City Police Department travelled to Philadelphia the same day and attempted unsuccessfully to execute the arrest warrant on the morning of October 6, 1971. Apparently, Rayborn had been released by the city authorities soon after his September arrest on the Philadelphia homicide charge. After this unsuccessful attempt to locate and arrest Rayborn, Detective Bologna filed the warrant with the Philadelphia Court of Common Pleas, in which Rayborn's local homicide charge was pending, and returned to New York. That same day, Rayborn failed to appear in court in connection with the Philadelphia homicide charge, and that court issued a bench warrant for his arrest.

Other than the events recited above, it is unclear what, if any, additional investigative efforts transpired between September 9, 1971, and July 1974. On July 12, 1974, under circumstances unknown to us, Rayborn was rearrested by the Philadelphia police. Two weeks later, on July 26, 1974, an indictment was filed in New York charging Rayborn with the intentional murder of Jesse Lee Starks in 1971 and unlawful possession of a weapon. Within a week, New York State Supreme Court, New York County, issued a warrant for Rayborn's arrest, based on the July 26th Starks homicide indictment. Although Rayborn apparently had been released again from custody sometime after his arrest on July 12, 1974, in Philadelphia, local police there rearrested Rayborn on the New York warrant one day after it was issued, on July 31, 1974. It appears that Rayborn was informed on that day, for the first time, of the pending New York homicide charge. Rayborn subsequently refused to waive extradition, and the New York County District Attorney's Office commenced extradition proceedings thereafter.

On or about October 30, 1974, the District Attorney's Office obtained an extradition warrant for Rayborn. However, because extradition papers had not been prepared early enough, the Governor of Pennsylvania did not sign them into effect before the expiration of a statutory 90–day period for the submission of such papers. As a result, the Philadelphia court had to release Rayborn on bail in late October 1974. *See* 42 Pa.Cons.Stat.Ann. §§ 9136, 9138 (Purdon 1982 & Supp.1988) (incarcerated suspect must be released from custody if state having jurisdiction of the offense allegedly committed by suspect has not filed governor's warrant within 90 days of suspect's incarceration).

In early November 1974, unaware of Rayborn's release, two New York detectives and a New York Assistant District Attorney ("ADA") travelled to Philadelphia to take Rayborn into custody, only to discover that he had been released. At that time, the officers learned that Rayborn was due to appear before the United States District Court for the Southern District of New York in early 1975 in connection with a federal narcotics charge that had been pending against Rayborn since 1966. *See United States v. Henry Collins Rayborn, et al.*, No. 66 Crim. 463 (1966–76, S.D.N.Y.). In either January or February of 1975, however, Rayborn failed to appear in the New York federal court and disappeared.

The record is silent with respect to the period that follows next, between February 1975 and March 1976. On April 23, 1976, however, Rayborn was arrested again in Philadelphia, approximately 14 months after his failure to appear in federal district court. Shortly thereafter, Philadelphia authorities informed New York authorities that Rayborn was once again in custody. Since Rayborn was still opposing extradition to New York at that point, New York and Philadelphia authorities agreed that the latter would prosecute Rayborn first on the Philadelphia homicide charge.

Both the Philadelphia and federal charges against Rayborn were concluded

over the course of the next six months. On August 16, 1976, Rayborn pleaded guilty to manslaughter in the Philadelphia Court of Common Pleas. On September 28, 1976, after having been arraigned in New York earlier in July, Rayborn was produced in the United States District Court for the Southern District of New York and pleaded guilty to the illegal sale of heroin in violation of 21 U.S.C. §§ 173 and 174. On or about October 16, 1976, Rayborn was sentenced to a one-to-ten year term of imprisonment on his Philadelphia homicide charge and was committed shortly thereafter to a Pennsylvania State Correctional Institution. On November 16, 1976, Rayborn was returned to New York and sentenced in federal district court to an indeterminate term of not more than five years on his federal narcotics charge, to run consecutively to the state sentence.

On March 22, 1977, Rayborn was delivered to the Bureau of Prisons to begin serving his federal sentence at the United States Penitentiary in Lewisburg, Pennsylvania; subsequently, he was transferred to the United States Penitentiary in Atlanta, Georgia on June 21, 1977, where he remained until October of 1978.

During the period from approximately mid–1976 to April 1978, while Rayborn was serving his sentences, a series of clerical mishaps occurred in the New York District Attorney's Office, and as a result, Rayborn's case was lost in bureaucratic limbo. During 1976, his case was reassigned several times within the District Attorney's Office. Because one of the reassignments was not recorded in the proper files, no particular ADA had responsibility for the case until April 1978, and, as a result, no action was taken by the District Attorney's Office during that period in connection with Rayborn's case.

This lack of oversight continued even though between November 1976 and April 1978 the Philadelphia District Attorney's Office and prison officials at the federal penitentiary in Atlanta attempted to contact the New York District Attorney's Office in order to determine whether it intended to file a detainer against Rayborn while he was in custody. During this period, in September 1977, Rayborn wrote to the District Attorney's Office from federal prison requesting that he be tried on the 1974 indictment, but that office apparently misplaced the letter. On April 7, 1978, after receiving no response to his letter from the New York District Attorney's Office, Rayborn moved in New York State Supreme Court to dismiss the homicide indictment for violation of his sixth amendment right to a speedy trial.

On June 23, 1978, New York Supreme Court Justice George F. Roberts denied Rayborn's motion to dismiss the indictment. Approximately two months later, on August 14, 1978, the District Attorney's Office requested that the federal Bureau of Prisons deliver Rayborn to New York pursuant to the Interstate Agreement on Detainers, and on October 6, 1978, Rayborn was produced in New York and arraigned on the 1974 Starks homicide indictment. On December 14, 1978, after a one-day bench trial, Rayborn was convicted of second degree murder.

### B. *The State Trial*

During the trial in New York State Supreme Court, the prosecution presented the testimony of two eyewitnesses, several officers, and a medical examiner. Rayborn, represented by counsel, testified on his own behalf.

At trial, the prosecution presented evidence to show that on the afternoon of September 9, 1971, Rayborn had driven with two companions, Chester Washington and William Cody, to the apartment of Jesse Lee Starks and demanded that Starks return money that Starks had allegedly stolen from Rayborn earlier that day. According to the prosecution, Rayborn shot Starks when Starks refused to repay the stolen money. Chester Washington and William Cody both testified against Rayborn at trial, and although neither of them actually saw Rayborn shoot Starks, Cody testified that he saw Rayborn load a revolver in the car on the way to Starks' apartment, and that he did see a gun in Rayborn's hand immediately after the

shooting. The defense, on the other hand, argued that it was William Cody and not Rayborn who had unsuccessfully demanded the money and then shot Starks.

Two other witnesses, Josephine Herron and Pamela Jones,[1] were also present at the scene when Starks was murdered, but by 1978, both women had become unavailable to testify at Rayborn's trial. Josephine Herron died in 1974, and the police were unable to locate Pamela Jones after attempting to find her several times in 1976. One of the policemen who arrived at the murder scene, however, Police Officer Smith, had taken notes in his memo book as to what these two witnesses told him had happened in Stark's apartment that afternoon. Officer Smith testified at Rayborn's bench trial and, over objection of defense counsel, related Herron and Jones' statements to him, using his memo book to refresh his recollection.

According to Officer Smith, the two women told him that three men entered the apartment on the afternoon of the murder: the first male whom they identified was black, fifty to sixty years old, about six feet tall and 250 pounds; the second male was identified as black, forty to fifty years old, six feet three inches tall, and about 170 pounds; and the third male, whom the women knew and identified as Bill Cody, was described as black, forty-three years old, and five feet eleven inches tall. According to Officer Smith, the two women stated that it was the first male who approached Starks and demanded money; when he failed to comply, this person, who was not known to them, then pulled a gun from his right pocket and shot Starks.

At the close of the December 1978 bench trial, Rayborn was found guilty of second-degree murder. On January 26, 1979, Rayborn appeared before Supreme Court Justice Leff for sentencing, and was sentenced to a minimum term of fifteen years imprisonment. On September 16, 1980, the Ap-

pellate Division unanimously affirmed Rayborn's murder conviction without opinion, *People v. Rayborn*, 78 A.D.2d 595, 432 N.Y.S.2d 40 (1st Dept.1980), and leave to appeal to the New York Court of Appeals was denied on November 6, 1980, *People v. Rayborn*, 51 N.Y.2d 1012, 435 N.Y.S.2d 1032, 417 N.E.2d 100 (1980). Having exhausted his state-court remedies, Rayborn filed the present petition for a writ of habeas corpus in the district court on August 26, 1983, arguing again, *inter alia*, that New York authorities had violated his sixth amendment right to a speedy trial. Judge Ward referred the petition to a United States magistrate for a report and recommendation, and on January 27, 1986, Magistrate Dolinger filed a report recommending that Rayborn's petition be denied. Although Rayborn had raised three claims in his original petition, he filed a timely objection only to the portion of the magistrate's report concerning his speedy trial claim, which Judge Ward then reviewed *de novo*, pursuant to Fed.R.Civ.P. 72(b) and 28 U.S. C. § 636(b)(1), in a Memorandum Decision dated July 1, 1987. After careful review, however, Judge Ward reached the same conclusion as that of Magistrate Dolinger and denied Rayborn's petition. This appeal followed.

## DISCUSSION

The right of an accused to a speedy trial is guaranteed by the sixth amendment, U.S. Const. amend. VI, and is imposed upon the states by the due process clause of the fourteenth amendment, *see Klopfer v. North Carolina*, 386 U.S. 213, 223, 87 S.Ct. 988, 993, 18 L.Ed.2d 1 (1967). Despite the "fundamental" importance of the sixth amendment's speedy trial right, however, *id.* at 223, 87 S.Ct. at 993, the right is "generically different" from any other right guaranteed by the Constitution. *Barker v. Wingo*, 407 U.S. 514, 519, 92 S.Ct. 2182, 2186, 33 L.Ed.2d 101 (1972).

---

**1.** The police officer who testified at Rayborn's trial identified the second woman as "Tamara Sheen," but Magistrate Dolinger concluded that the officer had misstated the second woman's name, and that she should have been identified as "Pamela Jones," based on his reading of

notes taken from the officer's memo book (which we discuss *infra*). Judge Ward accepted Magistrate Dolinger's finding with respect to the name of this second witness, and referred to the two missing eyewitnesses in his opinion only as "Josephine Herron" and "Pamela Jones."

This is true in large part because it is almost impossible to say with precision exactly when a particular defendant's speedy trial right has been violated. *See id.* at 521–22, 92 S.Ct. at 2187–88. Several different factors must be considered in determining whether a given period of delay violates a defendant's right, including the complexity of the case and whether it turns on the testimony of eyewitnesses who must remember events that occurred long before trial. *See id.* at 530–31 & n. 31, 92 S.Ct. at 2191–92 & n. 31. The right to a speedy trial is also unique because in many cases, deprivation of the right itself may actually "work to the accused's advantage," *id.* at 521, 92 S.Ct. at 2187, particularly if the passage of time has weakened the prosecution's case.

In *Barker v. Wingo,* the Supreme Court enumerated four factors which courts should consider in determining whether a criminal defendant has been denied this sixth amendment right: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant. *Id.* at 530, 92 S.Ct. at 2192. No one of these factors, however, is "either a necessary or sufficient condition to the finding of a deprivation of the right," and courts still must engage in a sensitive balancing process whereby the conduct of *both* the prosecution and the defendant are weighed. *Id.* at 530, 92 S.Ct. at 2192.

▮ In speedy trial cases, the length of the delay "is to some extent a triggering mechanism"; only if the delay is substantial are the other factors brought into play. *Id.* at 530, 92 S.Ct. at 2192. In this case, a period of over seven years elapsed between the date that an arrest warrant was issued for appellant and the date on which he was ultimately convicted on the New York murder charge. Because the delay was of such considerable length, the court below was required to analyze the remaining three factors in order to determine whether appellant's speedy trial right had been violated. *Id.* Moreover, because the amount of elapsed time between issuance of an arrest warrant and conviction was so substantial,

at trial the government was required to justify the delay in order to defeat the defendant's speedy trial claim. *See id.* at 531, 92 S.Ct. at 2192; *United States v. New Buffalo Amusement Corp.,* 600 F.2d 368, 377 (2d Cir.1979).

After reviewing the *Barker v. Wingo* factors, the district court held that despite the lengthy delay of over seven years, New York state authorities did not violate appellant's sixth amendment right to a speedy trial. Judge Ward reached this conclusion based on his findings that (1) most of the delay was caused by appellant's attempts to evade arrest, (2) the delay that was attributable to the District Attorney's Office was the result of clerical error and not deliberate malfeasance, (3) appellant's assertion of the right was "untimely," and (4) appellant was not prejudiced in any material way by the delay.

On appeal, Rayborn challenges the district court's conclusions with respect to whom was to blame for certain periods of delay, the significance of his assertion of his sixth amendment right, and the extent to which his defense was prejudiced by the seven-year delay. After carefully reviewing the record herein, however, we conclude that the district court was correct in determining that appellant's right to a speedy trial was not violated by the delay in this case. Further, Rayborn's evident lack of serious interest in a speedy prosecution of the charges against him, as shown by his fugitivity, together with the absence of a showing of prejudice to his defense, militate against finding that he suffered a deprivation of his sixth amendment right.

## A. *Cause of the Delay*

▮ In determining whether Rayborn or New York was to blame for most of the seven-year delay herein, the district court divided the seven-year period into discrete time periods and then decided who was principally responsible for each portion of the delay. Judge Ward found the following with respect to the overall eighty-six months of delay:

> [Appellant]'s propensity to jump bail or otherwise fail to appear in court accounts

for the first fifty-three of them. Neutral reasons amount to between ten and fourteen months of the remaining thirty-three months. The State is directly responsible for only eighteen to twenty-three months of this considerable delay. None of the prosecution's delay could be considered a deliberate attempt to impede [appellant]'s ability to present his case to the state courts. More significantly, the delays negligently occasioned by the State did not occur until almost six years had passed after the warrant for Rayborn's arrest issued.

Appellant's Appendix, Exh. C at 24.

We believe that the district court correctly allocated the blame for each portion of the eighty-six month delay among appellant, the government, and "neutral reasons" such as the time expended by the government in processing Rayborn's extradition papers, waiting for resolution of the Philadelphia and federal charges against Rayborn, and engaging in legitimate pretrial proceedings. Rayborn's principal argument on appeal, however, is that the district court erred in holding him responsible for the first four-and-a-half years of delay.

According to Rayborn, New York should have been held accountable for this period of delay because the state failed to prove that it exercised sufficient diligence in attempting to locate and apprehend Rayborn during this period. Therefore, he argues, because New York was responsible for the greater portion of the delay, the district court should have held that the seven-year lag between issuance of an arrest warrant and Rayborn's conviction violated his sixth amendment right to a speedy trial. For the reasons that follow, however, we believe that the district court was correct in holding appellant responsible for the period of delay beginning in September 1971 and ending in April 1976.

For most of this period, appellant Henry Rayborn was a fugitive from the law who consistently failed to appear before the courts, jumped bail, and attempted to avoid prosecution of first the Philadelphia charges and then the New York charges against him. While it is true that a defendant is not under any obligation to take affirmative steps to ensure that he will be tried in a timely fashion, *see Barker v. Wingo*, 407 U.S. at 527, 92 S.Ct. at 2190, a court need not ignore a defendant's fugitivity in considering whether there has been a violation of his sixth amendment right to a speedy trial.

■ Appellant correctly points out on appeal that whenever an individual has been officially accused of a crime, not only is the government charged with the burden of bringing the accused swiftly to trial, but it is under an obligation to exercise due diligence in attempting to locate and apprehend the accused, even if he is a fugitive who is fleeing prosecution. *See United States v. Diacolios*, 837 F.2d 79, 82 (2d Cir.1988); *United States v. DeLeon*, 710 F.2d 1218, 1221 (7th Cir.1983); *see also United States v. Bagga*, 782 F.2d 1541, 1543 (11th Cir.1986) (citing *Smith v. Hooey*, 393 U.S. 374, 383, 89 S.Ct. 575, 579, 21 L.Ed.2d 607 (1969), which established that government has affirmative obligation to locate and apprehend a known suspect). The determination as to whether a state has made sufficient efforts to satisfy the "due diligence" requirement is a fact-specific one, however, and the precise amount of effort that is required is apt to vary depending on the circumstances of the case. Thus, while a defendant's status as a fugitive will not relieve the state of its sixth amendment obligations, law enforcement officials are not expected to make heroic efforts to apprehend a defendant who is purposefully avoiding apprehension or who has fled to parts unknown. *See, e.g., Diacolios*, 837 F.2d at 83 (due diligence does not require government to pursue that which is "futile"); *Bagga*, 782 F.2d at 1543 (same); *DeLeon*, 710 F.2d at 1221–22. In this case, with respect to the period between 1971, when Rayborn was first arrested in Philadelphia, and 1976, when Philadelphia finally arrested Rayborn for the last time, the record evidence of New York and Philadelphia's joint efforts to bring Rayborn ultimately to trial, although not abundant, is adequate enough

to support a finding that New York acted with sufficient diligence to satisfy its obligations under the sixth amendment.

■ We note as a threshold matter that a state is perfectly entitled to rely in good faith upon the efforts of another jurisdiction when a suspect for whom an arrest warrant has been issued evades arrest in the first state and absconds to that other jurisdiction. Such reliance, if reasonable and grounded in the belief that the helping jurisdiction is in fact conducting a proper investigation, must be permitted, because to hold otherwise would be to establish a rule that states must conduct a "nationwide manhunt" for defendants who flee their jurisdiction. Thus, in evaluating New York's efforts to apprehend Rayborn and bring him to trial, we may also consider the efforts expended by Philadelphia during this same period.

In determining whether due diligence was exercised during the initial four-and-a-half year period, it is necessary to consider the whole two-state context in which the events herein occurred. Concededly, this is made difficult by the sparseness of the state court record. Nevertheless, the following facts can be gleaned from the record. In 1971, the New York State Supreme Court issued an arrest warrant for Rayborn shortly after New York police were informed of Rayborn's arrest by Philadelphia police. One day later, a New York detective travelled to Rayborn's home in Philadelphia to execute the first New York arrest warrant. When the detective was unable to locate Rayborn, he lodged the warrant with the Philadelphia court. In 1974, Philadelphia police arrested Rayborn twice over a period of several weeks, and after Philadelphia police informed New York that Rayborn had been arrested, New York authorities filed an indictment against Rayborn, prepared extradition papers to secure his return to New York, and then travelled to Philadelphia to take him into custody. Finally, in 1976, Philadelphia police arrested Rayborn for the last time, and Rayborn was subsequently convicted on the Philadelphia homicide and federal nar-

cotics charges that had been pending against him.

Although the details in the record are limited, we nevertheless conclude that, under these circumstances, New York authorities, acting either through or in concert with Philadelphia authorities, exercised sufficient diligence in attempting to locate and apprehend Rayborn between September 1971 and April 1976. There simply is no reason to believe that had New York or Philadelphia doubled or tripled efforts to locate Rayborn, they would have been successful. We agree with Judge Ward that Rayborn, who by any apparent assessment was a bail jumper and an absconderer, must bear the blame for the first four-and-a-half years of delay in this case. *See DeLeon*, 710 F.2d at 1221.

■ Rayborn also argues on appeal that the period of delay from October–November 1976, when he was sentenced on the Philadelphia homicide and federal narcotics charges, until April 1978, when the District Attorney's Office became active on the case again, should have been weighed more heavily against the state. While we do not condone New York's negligent handling of Rayborn's case during this period, we do not find Judge Ward's treatment of this portion of the delay to have been improper. As the district court correctly noted, the Supreme Court in *Barker* stated that negligent delays, although still a factor to be considered, should be weighed less heavily against the government than deliberate delays intended to hinder the defense. *See Barker*, 407 U.S. at 531, 92 S.Ct. at 2192. And in this case, we agree with Judge Ward that there is nothing in the record to suggest that the delay caused by New York was intentional or brought about for "tactical advantage." Thus, the district court did not err by refusing to weigh the delay caused by clerical and administrative errors more heavily against the state.

■ We note, however, that even if we were to find that New York was guilty of negligence in searching for Rayborn during the first four-and-a-half years, or that the delay thereafter attributable to New York State should have been weighed more

heavily against it, New York's negligence and lack of diligence alone would not mandate dismissal of Rayborn's murder conviction. *See also William Flowers v. Warden,* 853 F.2d 131, 132 (2d Cir.1988) (no sixth amendment violation even though "sole reason for [17–month] delay" in processing defendant's case was court docket congestion); *United States v. Carini,* 562 F.2d 144, 151–52 (2d Cir.1977) (although delay was a "patently long one" and "largely chargeable to the government," court still hesitated to find sixth amendment violation, and was only persuaded to do so by government's conceded violation of the Speedy Trial Act); *Georgiadis v. Superintendent, Eastern Correctional Facility,* 450 F.Supp. 975, 982 (S.D.N.Y.) (no violation even though substantial delay attributable to state), *aff'd mem.,* 591 F.2d 1330 (2d Cir.1978). As the Supreme Court stated in *Barker v. Wingo,* none of the enumerated factors possesses any "talismanic qualities" and no single factor is either a "necessary or sufficient condition to the finding of a deprivation of the right of speedy trial." 407 U.S. at 533, 92 S.Ct. at 2193. More important, as we have discussed, there is nothing in the record to suggest that New York purposefully delayed bringing Rayborn to trial in order to gain some kind of "tactical advantage," a practice clearly condemned by the Supreme Court which could warrant the severe remedy of dismissal. *See Barker,* 407 U.S. at 531, 92 S.Ct. at 2192; *Flowers,* 853 F.2d at 134; *United States v. Lane,* 561 F.2d 1075, 1079 (2d Cir.1977). The determination as to whether Rayborn was deprived of his right to a speedy trial would still depend upon whether the remaining *Barker* factors weighed in his favor.

Although we agree with the district court that Rayborn was the principal cause of most of the delay in this case, we nevertheless recognize that New York was still responsible for a portion of the seven-year delay. Because cause of the delay is only one of the factors enumerated in *Barker v. Wingo,* further analysis of the remaining factors is required before we can determine whether Rayborn's speedy trial right was violated.

Upon consideration of the two remaining factors—assertion of the right and prejudice to the defendant—we agree with the district court that both militate against acceptance of Rayborn's claim.

B. *Assertion of the Right*

■ In *Barker v. Wingo,* the Supreme Court rejected any kind of a rigid demand-waiver rule whereby a defendant's failure to demand a trial would constitute a *de facto* waiver of the speedy trial right. 407 U.S. at 528, 92 S.Ct. at 2191. Nevertheless, the Supreme Court recognized that although failure to assert the right does not act as a waiver, such failure will make it difficult for a defendant to assert his right successfully at some later point in time. *See also Georgiadis,* 450 F.Supp. at 980 (quoting *Barker* ). For example, in the *Barker* case itself, the Supreme Court determined that the defendant's speedy trial right had not been violated largely because the record established that the defendant "did not want a speedy trial." 407 U.S. at 534, 92 S.Ct. at 2194; *see also United States v. Schreiber,* 535 F.Supp. 1359, 1363 (S.D.N.Y.1982) ("The speedy trial requirements should not operate to reward a recalcitrant and reluctant defendant."). In criminal cases where a speedy trial claim is raised, both the conduct of the government *and* the conduct of the *defendant* are to be weighed, *Barker,* 407 U.S. at 530, 92 S.Ct. at 2192, and when it is manifestly apparent that a defendant has no serious interest in the speedy prosecution of the charges against him, a court need not ignore the defendant's fugitivity or recalcitrance in determining whether his sixth amendment rights have been violated.

■ In this case, Rayborn's status as a bail jumper, absconder, and fugitive during much of the eighty-six months of delay weighs heavily against him in our analysis of his speedy trial claim. Rayborn's first request for a speedy trial did not come until September 1977, nearly seven years after the Starks homicide and well over three years after he was informed of the subject charge. While it is true that Rayborn also subsequently moved to dismiss

the New York homicide charge against him in April 1978, and renewed that motion shortly before trial, given the totality of the circumstances in this case, we agree with the district court that Rayborn simply "raised his protests too lamely and too late." Appellant's Appendix, Exh. C at 26; *see also United States ex rel. Eccleston v. Henderson,* 534 F.Supp. 813, 816 (E.D. N.Y.) (one motion to dismiss for failure to provide speedy trial nine months after arrest and 9½ months before trial not "aggressive[ ] enough to warrant the relief ... sought"), *aff'd mem.,* 697 F.2d 289 (2d Cir.), *cert. denied,* 459 U.S. 871, 103 S.Ct. 157, 74 L.Ed.2d 131 (1982); *Dudley v. Dalsheim,* 526 F.Supp. 88, 93 (S.D.N.Y.1981) (20–month delay in asserting right found too long), *aff'd mem.,* 686 F.2d 110 (2d Cir.1982). While it is true that a defendant's assertion of his right is normally entitled to "strong evidentiary weight," *Barker,* 407 U.S. at 531, 92 S.Ct. at 2192, in this instance we agree with Judge Ward that the lack of timeliness, vigor, or frequency of Rayborn's assertions militates against according them strong evidentiary weight. *Cf. Cain v. Smith,* 686 F.2d 374, 384 (6th Cir.1982); *see also United States v. Fasanaro,* 471 F.2d 717, 718 (2d Cir.1973) (per curiam) (defendant's failure to assert his right in a timely fashion "left [the court] with the impression that he ... never wanted a speedy trial at all," which weighed in favor of not finding a deprivation of the right). In sum, we conclude that Rayborn's attempts to assert his right were simply too belated to weigh significantly in his favor.

## C. *Prejudice*

■ In *Barker v. Wingo,* the Supreme Court observed that one of the interests that the speedy trial right was intended to protect is the defendant's right to prepare an adequate defense. 407 U.S. at 532, 92 S.Ct. at 2193. Rayborn contends that the seven-year delay prejudiced his defense because two material witnesses whose testimony might have exculpated him had died or disappeared by 1978. As proof of the fact that he was prejudiced by their absence, Rayborn essentially relies on the testimony of Police Officer Smith, who arrived at Starks' apartment shortly after Starks was murdered.[2] In particular, Rayborn points to Pamela Jones and Josephine Herron's description of Starks' murderer to Officer Smith as evidence that their testimony could have exonerated him at trial. Rayborn claims that their statements to Smith establish that either or both of the two women *would* have testified at trial that he was not the murderer, because in their statements to the police they described the murderer as being six feet tall, while in fact Rayborn is only five feet, six-and-one-half inches tall. Rayborn also contends that even if they did not exonerate him, they may have at least failed to identify him, which in turn might have resulted in his acquittal. As Judge Ward noted below, however, Rayborn's contention that the testimony of the two women might have exonerated him is both speculative and belied by the facts.

At trial, the defense's stated theory of the case was that *Cody* and not the defendant fired the shot that killed Starks. Based on the testimony of the police officer who responded to the scene of the crime and made notes of their statements, however, it clearly appears that Josephine Herron and Pamela Jones' testimony would have *contradicted* this defense. According to Police Officer Smith, the two women clearly indentified someone *other than* Cody as the perpetrator. Moreover, although Herron and Jones' estimate of the killer's height did not correspond to Rayborn's ac-

---

**2.** In his brief, counsel for appellant actually relies on the *notes* taken by Officer Smith at the scene of the crime in arguing that Rayborn was prejudiced by the absence of Herron and Jones. It is clear from the state court record, however, that these notes were never entered into evidence at trial, although Officer Smith did use them to refresh his recollection when he testified. Consequently, although appellant included photocopies of Officer Smith's notes in the Appendix which he filed when he appealed Rayborn's conviction to the Appellate Division of the New York State Supreme Court, these notes technically form no part of the record on appeal. However, Officer Smith did testify at trial to basically all of the facts that are contained in the notes; hence our references to Smith's testimony instead of his notes.

tual height, the estimate of the murderer's *age* did correspond with his actual age. The two women told Officer Smith that the man who shot Jesse Starks was between the ages of fifty and sixty, and, in 1971, Rayborn was fifty-one years old. Cody, on the other hand, was only forty-three. In short, the statements of the two women which Rayborn relies on suggest that it may have been the *prosecution* and not the defense which was the party most prejudiced by Herron and Jones' absence from the trial.

Finally, we note that both women became unavailable during the time when appellant was a fugitive—Josephine Herron died in 1974, and Pamela Jones apparently disappeared in 1976. Thus, the claimed availability of the two women prior to their respective death and disappearance would have been of little or no benefit to Rayborn given his fugitive status at that time. As Judge Ward stated, "it ill behooves [Rayborn] to attempt to charge the State [now] with responsibility for the absence of ... witnesses who became unavailable during the time he was a fugitive."

In sum, we agree with the district court that Rayborn's defense was not perceptibly prejudiced by the absence of these two witnesses. While appellant correctly points out that a showing of prejudice is not a prerequisite to finding a sixth amendment violation, *see Moore v. Arizona*, 414 U.S. 25, 26, 94 S.Ct. 188, 189, 38 L.Ed.2d 183 (1973), courts generally have been reluctant to find a speedy trial violation in the absence of genuine prejudice, *see United States v. Mitchell*, 769 F.2d 1544, 1547 (11th Cir.1985) (unless the other three *Barker* factors all weigh heavily against the government, defendants must demonstrate actual prejudice), *cert. denied*, 474 U.S. 1066, 106 S.Ct. 819, 88 L.Ed.2d 792 (1986); *see also United States v. Martinez*, 776 F.2d 1481, 1483 (10th Cir.1985); *United States v. Jenkins*, 701 F.2d 850, 857–58 (10th Cir.1983).

## CONCLUSION

After considering the four *Barker v. Wingo* factors, we agree with the district court that Rayborn's sixth amendment right to a speedy trial was not violated. Although the state court record was not as fully developed as it could have been, we believe that there was sufficient evidence for the district court to conclude that New York met its sixth amendment obligation to exercise due diligence in attempting to locate and apprehend Rayborn. Moreover, we believe that Rayborn's decision to remain a fugitive even after he learned of the New York charges, to exercise his right to oppose extradition, and to delay requesting a speedy trial, all lead reasonably to the conclusion that, in the main, Rayborn had no serious interest in being speedily prosecuted with respect to the New York murder charge against him. We believe that Rayborn's initial fugitivity and subsequent failure to assert his right in a vigorous and timely manner, coupled with the absence of any prejudice to his defense, militate against accepting Rayborn's speedy trial claim. We have considered all of Rayborn's arguments on appeal, and find them to be without merit. Accordingly, we affirm the district court's dismissal of appellant's petition for a writ of habeas corpus.