JORDAN, Circuit Judge,
dissenting.
Whether Sergio Velazquez’s constitutional right to a speedy trial was violated is a close question, and, as my colleagues in the Majority point out, the answer hinges largely on the reasons for the delay in bringing him to trial. The primary issue is whether the government exercised reasonable diligence to find him, or, to phrase it differently, whether the government was negligent in its investigation. My colleagues reject the District Court’s determination that the government was not negligent, although that Court held an evi-dentiary hearing, carefully considered all of the evidence, and thoughtfully explored the factual and legal disputes. I think the Majority is mistaken. While the government’s investigative efforts fell well short of praiseworthy, they were not so lacking that, on this record, the District Court’s decision should be seen as reversible error. Given that conclusion, and the Dis *187 trict Court’s finding that Velazquez did not demonstrate specific prejudice from the delay, we should affirm. I therefore respectfully dissent from giving Velazquez a pass for dealing in multiple kilograms of cocaine.
I.
Considering the government’s obligation to exercise reasonable diligence in bringing a defendant to trial is an intensely fact-specific inquiry. “[T]he precise amount of effort that is required is apt to vary depending on the circumstances of the case,” Rayborn v. Scully, 858 F.2d 84, 90 (2d Cir.1988), so understanding the facts is particularly important. That, of course, is something that district courts, with their fact-finding capacity, are best suited to accomplish, and we are thus obliged to view a district court’s determination of reasonable diligence with, as the Supreme Court has put it, “considerable deference.” Doggett v. United States, 505 U.S. 647, 652, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). We must review the District Court’s underlying factual findings regarding a speedy trial claim for clear error, United States v. Battis, 589 F.3d 673, 677 (3d Cir.2009), and would be well-advised to think of “considerable deference” in the same terms, given the context.[1] A finding of fact is, as my colleagues note, clearly erroneous “only if we are left with a definite and firm conviction that a mistake has been committed.” United States v. Lessner, 498 F.3d 185, 199 (3d Cir.2007). It is not enough to be left with lingering questions.[2]
The Majority takes issue with two conclusions of the District Court: that the few investigative steps taken by the government between 2005 and 2010 may be excused in light of the more intense but fruitless efforts that preceded and followed that period, and that Velazquez’s off-the-grid lifestyle contributed to the delay. While I acknowledge that fair-minded people can differ about inferences and conclusions to be drawn from the record, I do not have a definite and firm conviction that the District Court erred in its handling of *188 those essentially factual issues or in its ultimate conclusion of reasonable diligence.
My colleagues begin by asserting that “law enforcement priorities have little role to play in the negligence calculus.” (Maj. Op. at 177.) I disagree and think it plainly relevant to consider the likelihood that an investigative step will bear fruit when considering what actions constitute reasonable diligence. The concept of “reasonableness” is itself dependent upon circumstances. “Reasonable diligence” necessarily incorporates the notion that specific circumstances, including but not limited to the constraints operating on the government, factor into what constitutes a reasonable investigative effort. The Majority relies on the Supreme Court’s statement in Doggett that “even if law enforcement inaction ‘may have reflected no more than [defendant’s] relative unimportance in the world of drug trafficking, it was still findable negligence.’ ” (Id. at 176 (quoting Doggett, 505 U.S. at 653, 112 S.Ct. 2686).) That statement, however, does not indicate that prosecutorial judgment about how best to deploy law enforcement resources should be given little or no weight. It was made in conjunction with the observation that, had government agents in that case tested “their progressively more questionable assumption that Doggett was living abroad, ... they could have found him within minutes.” Doggett, 505 U.S. at 652-53, 112 S.Ct. 2686. In other words, under the specific circumstances of that case, the lower prosecutorial priority assigned to the defendant did not offset the government’s utter failure to act on developments indicating his whereabouts.[3] Id. It bears repeating that “the precise amount of effort that is required is apt to vary depending on the circumstances of the case.” Rayborn, 858 F.2d at 90.
The Majority claims that there is “no evidence in the record to support a finding that investigators made an actual ‘choice’ not to pursue Velazquez.” (Maj. Op. at 177.) That is not entirely true. Notably, the District Court found that, after Deputy Degan’s departure, someone continued to work the case, and the Majority acknowledges that that person may have been Deputy Cardinal. It is not beyond the pale to believe that the person responsible for the case was making decisions about how to work it. To the extent my colleagues demand a clearer record that some “particular individual” made the decision “to forgo pursuit of Velazquez” (id. at 177), they miss the mark. Government decision-making at its best is the product of a deliberative process in which costs and benefits are weighed and reflected in a well-kept record. But decision-making is not always as carefully done or as clearly preserved as we would like, and yet we do not assume that government actions are random. The District Court heard the law enforcement witnesses and evidently believed that the limited investigative activity undertaken from 2005 to 2010 was the *189 product of informed discretion. I am not prepared to say that was clearly erroneous.[4] Nor am I willing to fault the District Court for thinking that later, more intensive but equally fruitless investigation could be seen as some vindication of an earlier government decision to do less. It is true that one cannot say that later failure proves — in a deductive sense — that earlier efforts would have failed, but those points of failure may add up inductively to allow a reasonable mind to determine that earlier decisions to do less were grounded in something better than sheer laziness.
The Majority makes too much of the fact that there is no record of the government taking all of the investigative steps suggested by Deputy Degan in 2005. The District Court was well aware that there was “no direct evidence that authorities in California exhausted the leads in Deputy Degan’s collateral request.” (App. at 20a.) However, it found that the additional leads were “far more speculative than [Velazquez’s] connection to the Woodward Avenue address” (id.), and it credited Deputy Degan’s “belie[f] that work was underway on [his] request” (id. at 7a). In other words, the Court accepted the deputy’s understanding of how the Marshals Service works, and it was entitled to do so.[5]
There is no dispute that, between August and November 2005, the government entered information about the charges against Velazquez into NCIC,[6] searched other databases for information, sent the 2005 collateral request to authorities in California to seek help, and visited the Woodward Avenue address, all to no avail. Between November 2005 and November 2010, the government periodically ran Velazquez’s name through NCIC and made sure that the warrant was still in the sys *190 tem.[7] No additional leads surfaced until a database check in November 2010 revealed a new place of employment for Velazquez. Given those circumstances, it was not clearly erroneous for the District Court to conclude that deputies could “infer[] failure” would have dogged further pre-2010 efforts in California to find Velazquez. (Id. at 21a.) It was, in turn, not clearly erroneous to decide that “the government reasonably elected to conserve its resources and wait for new information or a change in circumstances.” (Id.)
My colleagues in the Majority also reject the District Court’s determination that, purposefully or not, Velazquez’s decisions made it difficult for the government to find him. The Majority does acknowledge that “the absence of a paper trail for a defendant might leave the government with fewer avenues for investigation” (Maj. Op. at 180), but it gives that fact short shrift and instead expresses concern that taking account of a fugitive’s “transient” lifestyle “would likely be felt disproportionately by those in more limited economic circumstances” (id.). That concern is more a matter of speculation than proof at this point, but, assuming it is true, that does not address the investigative reality confronting the government both generally and in this case specifically. First, as a general matter, law enforcement decisions made under budgetary constraints and without any hint of improper motivation should not be overturned because of a vague concern that being hard to find is peculiar to the poor.[8] More specifically, however, in this case there was significant evidence indicating that Velazquez was quite deliberately hard to find, which is understandable since, as the Majority notes, “the record would support a finding that Velazquez was aware that he’ was being sought in connection with the [underlying] drug transaction.” (Id. at 179.) The District Court thought it unnecessary to take the final step of concluding that Velazquez was deliberately evading authorities, though it did note that the evidence “strongly supports the inference that [Velazquez] did hide.” (App. at 20a.) That evidence, and the District Court’s comment on it, should make us leery of overturning the Court’s determination that the government’s investigative efforts were reasonably diligent under the circumstances.
In sum, while law enforcement officers certainly could have done more to search for Velazquez, particularly between 2005 and late 2010, they were not obligated to take every possible action and chase every lead. See Rayborn, 858 F.2d at 90 (noting that the government must exercise only “due diligence” and not “heroic efforts”). *191 Given the considerable deference that we must give the District Court’s finding of reasonable diligence, I would accept it and turn attention to the question of prejudice.
II.
Because the government sufficiently demonstrated reasonable diligence, the District Court required Velazquez to show that he would suffer specific prejudice, not just general prejudice, from the passage of time in order to prevail on his speedy trial claim. That decision was in keeping with the Supreme Court’s instruction in Doggett, in which the Court held that, when the government has been negligent in its investigation and the delay is excessively long, “consideration of prejudice is not limited to the specifically demonstrable,” and defendants may claim prejudice without providing “affirmative proof of particularized prejudice.” Doggett, 505 U.S. at 655, 112 S.Ct. 2686. Conversely, if the government can show that it “pursued [a defendant] with reasonable diligence from his indictment to his arrest” — as the District Court concluded the government did here — then the defendant’s right to a speedy trial claim will fail, regardless of the length of delay, unless the defendant can show specific prejudice to his defense. Id. at 656, 112 S.Ct. 2686.
The Majority rightly notes that in general there are three types of prejudice that can result from delay: (1) oppressive pretrial incarceration; (2) the defendant’s anxiety and concern over the outcome of the litigation; and (3) impairment of the defense. Battis, 589 F.3d at 682. The prejudice that Velazquez asserts is impairment of his defense.
“[T]he possibility that the ... defense will be impaired by dimming memories and loss of exculpatory evidence” is the most important form of prejudice faced by a defendant when his right to speedy trial is denied. Doggett, 505 U.S. at 654, 112 S.Ct. 2686 (internal quotation marks omitted); see also Barker v. Wingo, 407 U.S. 514, 532, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) (“[Ijnabihty of a defendant adequately to prepare his case skews the fairness of the entire system.”). Generally, the burden of showing prejudice is on the individual claiming the violation, see Hakeem v. Beyer, 990 F.2d 750, 760 (3d Cir.1993), and the mere “possibility of prejudice is not sufficient to support [the] position that ... speedy trial rights were violated.” United States v. Loud Hawk, 474 U.S. 302, 315, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986) (emphasis added). In Hakeem v. Beyer, one of the defendants argued that he would suffer prejudice because the delay prevented him from calling witnesses to corroborate his alibi defense to robbery. 990 F.2d at 763. We rejected that argument, holding that, absent extreme circumstances, “[g]eneral allegations that witnesses’ memories have faded are insufficient to create prejudice.” Id.
As the District Court observed, Velazquez “relies almost exclusively on the general assertion that he is prejudiced by the passage of time because witnesses to his whereabouts and involvements may be impossible to locate and those witnesses that are available will have impaired memories.” (App. at 25a (internal quotation marks omitted).) I agree with the District Court that Velazquez’s claims in this regard are “too general and too speculative” to demonstrate specific prejudice. (Id.)
Velazquez also argues that his ability to investigate an entrapment defense has been impaired. As the Court pointed out, however, the informant’s conversations with Velazquez on July 3, 2005 and those that took place over the phone were recorded, and the testimony from co-defendants Pedro Curiel and Nelson Gutierrez-Gainza at Gutierrez-Gainza’s trial is avail *192 able. Velazquez “failed to identify any specific witness or piece of evidence that he now cannot access.” (Id. at 26a.)
Because Velazquez did not carry his burden of proving particularized prejudice, the District Court correctly determined that, under the circumstances of the case, he did not demonstrate a right to relief.
III.
This case presents a serious question regarding the unusual delay between indictment and trial, but I believe the District Court handled the matter wisely and well, and I would therefore affirm its decision that Velazquez’s constitutional right to a speedy trial was not violated. I thus respectfully dissent.

. There is a persuasive argument that the “considerable deference” standard for the reasonable diligence determination is simply another way of saying “clearly erroneous review.” In referencing "considerable deference,” the Supreme Court in Doggett, 505 U.S. at 652, 112 S.Ct. 2686, cited Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 401-02, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990) (“The [Supreme] Court has long noted the difficulty of distinguishing between legal and factual issues.... The considerations involved in the Rule 11 context are similar to those involved in determining negligence, which is generally reviewed deferentially.”), and McAllister v. United States, 348 U.S. 19, 20-22, 75 S.Ct. 6, 99 L.Ed. 20 (1954) (finding, in an admiralty case, that a district court’s findings of negligence were not clearly erroneous). The Dog-gett Court also cited a section of Wright and Miller's Federal Practice and Procedure discussing negligence cases and stating that the “natural” reading of McAllister is that "a determination of negligence is reviewed under the 'clearly erroneous’ rule.” 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2590 (1st ed.1971); see also Doggett, 505 U.S. at 652, 112 S.Ct. 2686.

. We review legal conclusions regarding a speedy trial claim, including the balancing of the Barker factors, de novo. See Battis, 589 F.3d at 677; Hakeem v. Beyer, 990 F.2d 750, 771 (3d Cir.1993). The Supreme Court has held that no single factor is "either a necessary or sufficient condition,” and the factors “must be considered together with such other circumstances as may be relevant.” Barker v. Wingo, 407 U.S. 514, 533, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Even accepting my colleagues' conclusions regarding the length of delay in this case and Velazquez's assertion of his right to a speedy trial, however, a defendant’s speedy trial claim will typically fail when the government has demonstrated reasonable diligence and the defendant has failed to show specific prejudice. See Doggett, 505 U.S. at 656, 112 S.Ct. 2686.

. I recognize the Supreme Court's concern that "[cjondoning prolonged and unjustifiable delays in prosecution would both penalize many defendants for the state's fault and simply encourage the government to gamble with the interests of criminal suspects assigned a low prosecutorial priority.” Doggett, 505 U.S. at 657, 112 S.Ct. 2686. However, for the reasons discussed herein, the delay here was not unjustifiable. While I do not advocate blind deference to executive decisions about the allocation of law enforcement resources,'I do believe that requiring constant government activity in fugitive cases, regardless of the prospects that such activity will bear fruit, may rightly be perceived as unwelcome and unnecessary judicial meddling in the executive sphere. There is ample room to disagree with executive decisions on resource allocation before one arrives at the point where a constitutional violation should be declared.

.Although, as my colleagues point out, the District Court did not hear directly from any law enforcement officer who worked on the case between 2005 and 2010, there was certainly circumstantial evidence that somebody worked on it after Deputy Degan’s departure. For example, Deputy Degan testified that someone in the Marshals Service would have been assigned to the case, and somebody in the Marshals Service did indeed run period NCIC checks between 2005 and 2010. In addition, DEA Agent Pedrini made sure that Velazquez's warrant remained active in the NCIC during that time and was in contact with the Marshals Service to see if there was any new information on the case. The Majority seems to think that the level of deference I believe should be given to the District Court’s "reasonable diligence” ruling amounts to no review at all. (See Maj. Op. at 177 n. 15.) That is a basic disagreement. I believe a reasonable inference that someone was assigned and working the case can be drawn from the record, and, again, under clear error review, I am not left with a definite and firm conviction that, in light of the totality of the circumstances, the District Court erred in concluding that the work done was sufficient to constitute reasonable diligence.

. I note parenthetically my disagreement with any implication in the Majority opinion that Deputy Degan’s suggested list of investigative steps should be viewed as the measure of reasonable diligence. (Maj. Op. at 180.) Though my colleagues disclaim relying on it (see id. at 181 n. 17), a reader might nonetheless conclude that the references to that list are meant to give it weight. One officer’s investigative suggestions to another on the opposite side of the country, however, may vary from what the receiving officer’s local experience tells him will and will not be worthwhile. That difference of opinion does not make the receiving officer a slacker. Moreover, we risk building a perverse incentive into the system if we turn suggestions into requirements. There may be fewer suggestions committed to paper if deputy marshals believe that courts will turn unfollowed leads into “stay out of jail free” cards for fugitives.

. "NCIC,” as the Majority notes, is the acronym for the National Crime Information Center, a database of criminal justice information.

. Velazquez relies on United States v. Fernandes, 618 F.Supp.2d 62 (D.D.C.2009), and United States v. Mendoza, 530 F.3d 758 (9th Cir.2008), for the proposition that merely entering names into a database — as he characterizes the government's efforts between November 2005 and November 2010 — -is insufficient to meet reasonable diligence. As the District Court noted, however, both cases are distinguishable because they are extradition cases involving fugitive defendants who had left the country. Periodically entering a fugitive's name into a national warrant database when the individual is believed to still be in the country, as is the case here, provides some chance that the fugitive might be found by authorities somewhere within the United States. It cannot be compared to doing the same for a fugitive believed to be outside of the country, in which case extradition is "the most obvious step” to bring that person promptly back for trial. Fernandes, 618 F.Supp.2d at 71.

. There may be significant challenges tracking people at the other end of the economic scale too, since a person of means who is constantly traveling or moving among multiple addresses may be as difficult to find as someone who is not well-rooted in society.